FILED
CHARLOTTE, NC

APR 2 7 2007

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

# UNITED STATES DISTRICT COURT

__Western__ DISTRICT OF __North Carolina__

UNITED STATES OF AMERICA
V.
JAIME LIGATOR

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

Case Number: 3:07MJ90

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about __May 2005 to present__ in __Mecklenburg__ County, in the __Western__ District of __North Carolina__ defendant(s) did,

*(Track Statutory Language of Offense)*
Together with others, combined, conspired, confederated and agreed together and with each other to knowingly and willfully devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted, by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, which were all routed through Western Union facilities located in Charlotte, Mecklenburg County, North Carolina, for the purpose of executing such scheme and artifice, and attempting to do so.

in violation of Title __18__ United States Code, Section(s) __371, 1343, and 2326__.

I further state that I am a(n) __Special Agent, DHS ICE OI__ and that this complaint is based on the
                                    Official Title
following facts:

See Attachment – Facts in support of Criminal Complaint.

Continued on the attached sheet and made a part of this complaint: ☒ Yes ☐ No

_____
Signature of Complainant

James S. Martin
Printed Name of Complainant

Sworn to before me and signed in my presence,

__April 27, 2007__ at __Charlotte, North Carolina__
Date                                              City and State

Carl Horn, III, U. S. Magistrate Judge       _Carl Horn, III_
Name and Title of Judge                       Signature of Judge

# AFFIDAVIT

I, James S. Martin, declare under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the following is true and correct to the best of my knowledge and information:

1. I am a Special Agent employed by the United States Department of Homeland Security, Immigration and Customs Enforcement, Office of Investigations (DHS ICE OI), Charlotte, North Carolina. Prior to March 1, 2003, I was employed by the Department of the Treasury, United States Customs Service, Office of Investigations, Charlotte, North Carolina. I have been employed by these two federal agencies as a Special Agent since 1987. During the course of my federal law enforcement career, I have received recurring, specialized training at the Federal Law Enforcement Training Center in Glynco, Georgia, and I have been the case agent in over one hundred criminal and civil investigations. As a Special Agent for ICE, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. The statements contained in this affidavit are based upon information I have collected during the course of an investigation, as well as information provided by other law enforcement officials, and based upon my experience and background as a law enforcement officer.

2. I am familiar with the information contained in this affidavit based upon my own participation in the investigation, my review of documents and records, review of victim interviews and statements, and conversation and briefings I have had with other law enforcement agents. This affidavit should not be construed to be a full and complete

rendition of all the facts in this case. I have set forth only the facts that I believe are necessary to support the charges in the criminal complaint that violations of federal law have occurred.

3. This Affidavit is submitted in support of a Criminal Complaint against JAIME LIGATOR (herein after referred to as LIGATOR) for violations of Title 18 United States Code, § 371 (Conspiracy), Title 18 United States Code, § 1343 (Wire Fraud), and Title 18 United States Code, § 2326 (Telemarketing Enhancement).

4. In or about early 2002 to the present, in the Western District of North Carolina, and elsewhere, LIGATOR did knowingly and intentionally conspire and agree with others to devise a scheme and artifice to defraud and to obtain money and property from individuals by means of materially false pretenses, representations and promises and, to transmit and cause to be transmitted, by means of wire, radio and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, specifically Western Union wire transfers which were all routed through Western Union facilities in Charlotte, Mecklenburg County, North Carolina, for the purpose of executing such scheme and artifice, and attempting to do so, contrary to Title 18, United States Code, § 1343 (Wire Fraud), in violation of Title 18, United States Code, § 371 (Conspiracy) and § 2326 (Telemarketing Enhancement).

5. The source for your affiant's information and the grounds for his belief are as follows:

## BACKGROUND

6. Since on or about April 2003, agents with the Department of Homeland Security, Immigration and Customs Enforcement, the Department of Commerce Office of Inspector General, the United States Postal Inspection Service, and the North Carolina

Department of Justice have been investigating a fraudulent sweepstakes scheme that targets U. S. residents, and in particular, elderly victims. The assigned agents received information from co-conspirators of the scheme and other sources that LIGATOR and other known and unknown conspirators have engaged in a scheme to defraud U. S. residents by deceiving them into believing that they have won a large monetary prize in a sweepstakes contest which requires them to wire transfer a purported "insurance fee" in order to receive their "winnings."

7. As used in this affidavit, the following terms are defined as follows:

   a. A "call center" is a business that engages in the illegal scheme. These operations are also referred to as "boiler rooms;"

   b. A "pitch sheet" is a script designed to be read over the telephone to a prospective victim. The pitch sheets contain misrepresentations and false statements. The telemarketers are not required to read verbatim from the pitch sheets. The telemarketers are allowed to ad lib in order to close the deal.

   c. A "rebuttal" is a prepared response to anticipated questions or objections which are often raised by prospective victims after hearing the sales pitch;

   d. An "opener" describes an employee of a call center who has the initial contact with the prospective victim by telephoning the victim whose name, address, and telephone number had been supplied as a "lead";

   e. A "loader" describes the call center employee who takes over the contact with the victim after the victim has made an initial payment as a result of the pitch given by the opener. The loader, who is usually a more experienced salesperson than the opener, induces the victim to send

money in various fees and insurance required to retrieve a non-existent sweepstakes prize.

f. A "reload" is a sale to a victim who previously sent money to retrieve a sweepstakes prize. The loader will usually inform the victim that the initial prize amount they were told they own had been increased due to either a clerical error or another prize winner being disqualified.

g. A "Cedula de Residencia (Cedula)" is a national identification card with a unique number issued by the Costa Rican government to Costa Rica citizens and permanent residents.

## WESTERN UNION WIRE TRANSFERS

8. Victims of this scheme were routinely instructed by the defendant and his co-conspirators to send their purported sweepstakes insurance fees to Costa Rica via Western Union wire transfers. Western Union representatives have confirmed that all Western Union wire transfers are electronically routed and processed in and through Charlotte, North Carolina prior to being sent to their ultimate destinations, including Costa Rica.

## THE SCHEME

9. The investigation has revealed that since early 2002 the defendant and his co-conspirators have telephoned U. S. residents from Costa Rica; in particular elderly U. S. residents, and typically have informed them that they have won second prize in a sweepstakes, purportedly in the range of between $350,000 and $450,000 in cash. They tell their victims that, in order to receive the prize, they must send from one thousand to several thousand dollars for a purported refundable insurance fee, via Western Union money wire transfers, to Costa Rica as payment to a non-existent

insurance company in Costa Rica to insure safe delivery of the prize money. The defendant and his co-conspirators falsely tell most of their victims that "Lloyd's of London of Costa Rica" will insure their sweepstakes winnings. Investigation has shown that Lloyd's of London does not have a Costa Rican office, nor does it insure these types of transactions. As the sweepstakes is fictitious, the defendant and his co-conspirators simply keep the victims' supposed "refundable insurance fees" without sending any "winnings" to the victim.

10. In order to induce their victims to wire money to Costa Rica the defendant and his co-conspirators often falsely represent themselves as being agents of a non-existent "United States Sweepstakes Security Commission" or the "United States Sweepstakes Security Bureau" or other similar fictitious agencies in Washington, D.C. The defendant and his co-conspirators falsely represent that these agencies are (1) branches of the U.S. Department of Commerce, and other federal agencies, or (2) that these agencies are charged with ensuring that sweepstakes winners receive their money.

11. If an intended victim requests proof that he/she has won a sweepstakes prize, the defendant and his co-conspirators give the victim telephone numbers that appear to be located within the United States, but which are actually in Costa Rica. The defendant and his co-conspirators will answer these telephone calls and falsely reassure the victims that they have won a sweepstakes prize. If an intended victim wants written proof of the existence of the bogus "United States Sweepstakes Security Commission," or the bogus "United States Sweepstakes Security Bureau," or similar fictitious entities, the defendant and his co-conspirators fax the intended victim a document setting forth a bogus history of the Sweepstakes Security Commission, onto which has been placed

the authentic seal of the Bureau of Industry and Security of the Department of Commerce, or other federal agencies, and/or a false Washington, D.C. mailing address.

12. Once a victim sends money for the purported insurance fees for the second prize winnings, the defendant and his co-conspirators call or "re-load" their victims and falsely represent that a mistake had been made, and that the victim has actually won first prize (typically three million dollars or more), but that this requires the victim to wire thousands of additional dollars for bogus refundable "fees" through Western Union to insure the safe delivery of the sweepstakes proceeds. The defendant and his co-conspirators continue to call to "re-load" their victims so long as the victims continue to wire money.

13. The investigating agents have identified numerous "call centers" in Costa Rica from which the defendant and other co-conspirators have called U. S. residents in furtherance of the sweepstakes scheme.

## THE DEFENDANT AND HIS CO-CONSPIRATORS' USE OF VOICE OVER INTERNET PROTOCOL (VoIP) TO CALL VICTIMS

14. Investigating agents have tracked several telephone numbers that victims have identified from their caller identification devices as being used to conduct the sweepstakes scheme by the defendant and his co-conspirators, and have found those numbers were assigned to a telecommunication company that used Voice over Internet Protocol (VoIP), a telecommunications technology utilizing a computer to make telephone calls over the Internet. This technology also allows a user to disguise his calling location, making it appear the call is originating from another area code. The telecommunications company provided agents with subscriber records identifying the

owner of the telephone numbers (hereinafter "the subscriber") that were being used to conduct the scheme.

## COOPERATING WITNESSES

15. Investigating agents have interviewed at least seven sources of information (co-defendants Hennessey, Cunningham, Kalchstein, Coyle, Nyffeler, Bingham, Duncan, and Barker) that have participated in this scheme. All except Nyffeler have worked in various telemarketing call centers in Costa Rica. Many of them met each other while they were employed in call centers working the fraudulent sweepstakes scheme.

16. A great deal of the information provided to investigating agents was independently corroborated, which strongly confirmed the accuracy of their information. Through information provided by the various cooperators, investigating agents learned 1) the co-conspirators' use of VoIP technology; 2) the co-conspirators' use of Western Union to receive funds from victims; 3) the fact that the co-conspirators typically inform their victims they have won between $350,000 and $450,000; 4) the fact that the co-conspirators typically reload victims by claiming that prize was a much larger amount, usually between 3.5 and 4.5 million; 5) that the conspirators typically claimed that "Lloyds of London of Costa Rica" was the insurer of the fraudulent sweepstakes winnings; 6) the identity of the VoIP providers used by the call centers; 7) the criminal histories of several of the conspirators; 8) the appearance by a co-conspirator before a federal grand jury in the United States; and 9) aliases used by the co-conspirators when they call victims in the United States. The conspirators in the call centers (including defendant LIGATOR) knew that every assertion in the pitch was false. Many victims of the sweepstakes scheme have confirmed to agents that they were told by the conspirators that that they worked for the Sweepstakes Security Commission. The

raids of May 16, 2006, produced copies of the exact pitches, reloads, and rebuttals given by the conspirators while working in the call centers using the fraudulent sweepstakes scheme. According to this pitch sheet the telemarketers are to tell the victims that:

    a. My name is _____. I am calling from the Sweepstakes Security Commission in Washington, DC. We are a non-profit consumer protection agency, established by the government to monitor and control all activities of the sweepstakes and lotteries; and of course to assist recipients of awards.

17. Since the calls to victims were made from Costa Rica, the telemarketers understood that the above assertions were false. Thus, anyone who made calls or even worked and listened to the calls knew that the calls were false and were made to deceive and defraud consumers. Accordingly, everyone who worked at call centers that I have described in this affidavit had knowledge that they were participating in a fraud.

18. According to another document, if a victim agreed to send money but failed to do so, a conspirator would call the victim and make the following false representations to the victim:

    a. What do you mean? You remember you gave me your verbal authorization on a recorded conversation with your Federal Government to secure that policy with Lloyd's.

    b. One, if you didn't take care of that, Lloyd's has nothing to assume other than you were expecting to receive the check without a policy on it. That would be insurance fraud, a serious crime. Luckily, the Sweepstakes Security Commission would not let the check be delivered under such circumstances. Failure to take care of your obligation therefore is called "intent to commit insurance fraud," a misdemeanor.

    c. Two, remember that I am a Federal Agent and your agreement was recorded. You understand that there are laws in place for reasons of national security that prevent citizens from deceiving government employees of my rank. I know you are not a terrorist but we must

> still apply the law. This crime is called "defrauding a Federal
> Agent." It is a Federal misdemeanor.

19. This document makes clear to me as an agent that since there were no federal agents working in the call center, it would be clear to anyone working or present at a call center that fraudulent representations were being made.

20. The techniques used by the call centers operating the fraudulent sweepstakes scheme to motivate and assist the conspirators making the pitches include posting reminders and motivational statements in their work area. An example of a posted reminder is the following:

   a. IF YOU HAVE THE SLIGHTEST SUSPICION THAT YOU ARE SPEAKING WITH SOMEONE SLIGHTLY INTELLIGENT, BEING RECORDED, ON A THREE WAY CALL, BEING TRACED, SPEAKING WITH LAW ENFORCEMENT, AND SO ON, DO NOT EVEN ATTEMPT TO USE IT!! THIS COULD KILL AN OFFICE

21. In my experience as a federal agent, these types of exhortations are indicative to me of fraudulent activity and I believe it would be clear to anyone working or present at a call center that fraudulent representations were being made there.

22. According to numerous sources, the "Openers" were paid 40% of whatever they made from the initial telephone calls to victims. Once the "runners" picked up the money from Western Union the "Openers" were paid in cash. On average an "Opener" would have to make between 100 to 250 telephone calls before one victim was enticed into making the first transfer of funds to Costa Rica. It was typical for an "Opener" to obtain $1,000 to $4,500 from a victim. It was not unusual for an "Opener" to be paid between $1,000 - $1,200 for each victim. By Costa Rican economic standards, a co-conspirator could live financially extremely well on such illicit earnings. The "Loaders" were paid 20% of all of the loads but because the victims had already been convinced

of the legitimacy of the "sweepstakes," they experienced a substantially higher success rate per call than did "Openers." Moreover, the money that a "Loader" extracted from a victim was typically in the tens of thousands of dollars. The call center owner's profits were 50% from the "Openers" and 70% from "Loaders." Runners were typically paid 10%.

23. Investigation has revealed that LIGATOR was a co-owner in the fraudulent telemarketing center operated by co-defendant Martin Kalchstein. Kalchstein has stated that other owners of the call center included Jose Pablo Badilla-Villanueva, and co-defendant Michael Mangarella. According to Kalchstein, LIGATOR provided the money to fund the opening of the call center, and he was also responsible for the purchase and installation of various components of the office infrastructure, including the telephone lines and the purchase of furniture to be used by telemarketers. In addition, LIGATOR oversaw and monitored the daily financial activities of the call center. Kalchstein stated that LIGATOR initially took 21.3% of the proceeds from the profits generated by the call center, and his share of the profits was later increased to 33.3% when co-defendant Mangarella left the call center. Kalchstein stated that from late September 2005 until the end of December 2005, LIGATOR was paid $20,000.00 per week from the call center proceeds. Kalchstein further stated that after the initial start-up, LIGATOR rarely made trips to the call center, and always had his share of the money delivered to him each week. Kalchstein stated that LIGATOR always took his share of the proceeds in cash, and that he (Kalchstein) delivered LIGATOR's share of the proceeds to him at the horseshoe casino in San Jose on several occasions. Kalchstein stated that he observed LIGATOR at the call center when it was in full operation and fraudulent calls were being

made, and that LIGATOR was fully aware of the fraudulent activity that occurred at the call center in order to generate the profits that he shared in.

24. Co-defendant Cunningham has also stated that LIGATOR was one of the owners of the call center known as the Kalchstein call center. Cunningham stated that when he first started in the fraudulent telemarketing schemes, the first call center he worked in was the one run by Kalchstein. Cunningham stated that although he calls it Kalchstein's call center, he knew at the time that it belonged to several different people, LIGATOR being one of them.

## THE DEFENDANT

25. JAIME LIGATOR is a United States citizen, who is last known to have an address in Boca Raton, Florida. His date of birth is 02/02/1942, and his social security number is XXX-XX-4249.

## VICTIMS

26. On September 29, 2005, investigators from the U.S. Department of Commerce interviewed LS, 76-year-old resident of Harlem, Georgia. LS stated in substance that in March 2004 while he was recovering from a stroke, he started receiving telephone calls from one of the co-conspirators telling him he was the winner of a sweepstakes lottery prize. The victim was told he would need to purchase insurance with Lloyd's of London to cover the transaction. The victim was instructed to wire the insurance fees via Western Union to Costa Rica. After he sent the money, LS was contacted again by co-conspirators and told his winnings were actually much larger and additional insurance money needed to be sent. The victim told investigators that this pattern occurred several times and sometimes the callers claimed to be U.S. Customs agents. LS stated

he wired money to Costa Rica via Western Union on April 23, April 27 and again on April 28, 2004, for a total of approximately $8,000.

27. During the course of this investigation, investigating agents have identified (and continue to identify) hundreds of United States residents (victims) who have been telephonically contacted by the defendant and other known and unknown co-conspirators operating this sweepstakes scheme. To date, a conservative estimate of $10 million has been lost by U.S residents to the conspirators in this sweepstakes scheme.

28. Based on the foregoing, your Affiant submits that there is probable cause to believe that evidence exists for violations of Title 18, United States Code, Sections 371 (Conspiracy) and 1343 (Wire Fraud) by defendant JAIME LIGATOR and other known and unknown co-conspirators. Furthermore, because the majority of victims are older than age 55, Title 18, United States Code, Section 2326 (Telemarketing Enhancement) may also be applicable to defendant JAIME LIGATOR and other known and unknown co-conspirators.

James S. Martin
Special Agent
DHS ICE OI

Sworn and subscribed to before me

This 27th Day of Apr., 2007.

United States Magistrate Judge